# MOODY *v.* DAGGETT

No. 74–6632. Argued October 12, 1976—Decided November 15, 1976

*Phylis Skloot Bamberger*, by appointment of the Court, 425
U. S. 932, argued the cause and filed briefs for petitioner.

*Frank H. Easterbrook* argued the cause for respondent *pro
hac vice*. With him on the brief were *Solicitor General Bork,
Assistant Attorney General Thornburgh, Jerome M. Feit*,
and *George S. Kopp*.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the
Court.

We granted certiorari in this case to decide whether a
federal parolee imprisoned for a crime committed while on
parole is constitutionally entitled to a prompt parole revoca-
tion hearing when a parole violator warrant is issued and
lodged with the institution of his confinement but not served
on him.[1]

---

*Briefs of *amici curiae* urging affirmance were filed by *Andrew P. Miller*,
Attorney General, and *Linwood T. Wells, Jr.*, Assistant Attorney General,
for the Commonwealth of Virginia; and by *R. A. Ashley, Jr.*, Attorney
General, *Robert E. Kendrick*, Deputy Attorney General, and *David L.
Raybin*, Assistant Attorney General, for the State of Tennessee, joined by
the Attorneys General for their respective States as follows: *Wayne L.
Kidwell* of Idaho, *William F. Hyland* of New Jersey, *Jim Guy Tucker* of
Arkansas, *Evelle J. Younger* of California, *R. Lee Johnson* of Oregon,
*Francis B. Burch* of Maryland, *David R. McLeod* of South Carolina,
*Paul L. Douglas* of Nebraska, *Robert F. Stephens* of Kentucky, *Rufus L.
Edmisten* of North Carolina, *William J. Brown* of Ohio, and *William J.
Scott* of Illinois.

[1] This constitutional issue has divided the Courts of Appeals. Three
of the Circuits have concluded that a parolee convicted of crime com-

### (1)

In 1962 petitioner was convicted in the United States District Court for the District of Arizona of the crime of rape on an Indian reservation, in violation of 18 U. S. C. § 1153. There was no appeal, and petitioner received a 10-year prison sentence. He was paroled in 1966 with almost six years remaining to be served. While on parole, petitioner shot and killed two persons on the Fort Apache Indian Reservation. He was convicted on a guilty plea of manslaughter as to one victim and second-degree murder as to the other, for violations of 18 U. S. C. § 1153; he received concurrent 10-year sentences for these two offenses. These crimes constituted obvious violations of the terms of petitioner's 1966 parole. See 18 U. S. C. § 4203 (a) (1970 ed. and Supp. V).

Soon after petitioner's incarceration for the two homicides, the United States Board of Parole issued but did not execute a parole violator warrant; this was lodged with prison officials as a "detainer." [2] Petitioner requested the Board to execute

---

mitted while on parole is entitled to a due process hearing promptly upon issuance of the parole violator warrant and detainer. *Jones* v. *Johnston,* 175 U. S. App. D. C. 151, 534 F. 2d 353 (1976), cert. pending *sub nom. Sigler* v. *Byrd,* No. 76–355; *United States ex rel. Hahn* v. *Revis,* 520 F. 2d 632 (CA7 1975), mandate recalled, No. 74–1057 (Aug. 27, 1975); *Cleveland* v. *Ciccone,* 517 F. 2d 1082 (CA8 1975). Other Circuits have held that no due process requirements attach at this time. *Reese* v. *U. S. Bd. of Parole,* 530 F. 2d 231 (CA9 1976), cert. pending *sub nom. Reese* v. *U. S. Parole Comm'n,* No. 75–6703; *Gaddy* v. *Michael,* 519 F. 2d 669 (CA4 1975), cert. pending, No. 75–5215; *Orr* v. *Saxbe,* No. 74–341 (MD Pa., Nov. 27, 1974), aff'd without opinion, 517 F. 2d 1399 (CA3 1975), cert. pending *sub nom. Orr* v. *Levi,* No. 75–5594; *Colangelo* v. *U. S. Bd. of Parole,* No. 74–251 (WD Ohio, Dec. 11, 1974), aff'd without opinion, 517 F. 2d 1404 (CA6 1975); *Small* v. *Britton,* 500 F. 2d 299 (CA10 1974); *Cook* v. *U. S. Attorney General,* 488 F. 2d 667 (CA5), cert. denied, 419 U. S. 846 (1974).

[2] A detainer in this context is an internal administrative mechanism to assure that an inmate subject to an unexpired term of confinement will

the warrant immediately so that any imprisonment imposed for violation of his earlier parole under the rape conviction could run concurrently with his 1971 homicide sentences. The Board replied that it intended to execute the warrant only upon petitioner's release from his second sentence. At its 1974 annual review of petitioner's case, the Board re-affirmed its decision to allow the warrant to remain unexecuted.

Relying on *Morrissey* v. *Brewer,* 408 U. S. 471 (1972), petitioner began this federal habeas corpus action in January 1975, seeking dismissal of the parole violator warrant on the ground that he had been denied a prompt hearing at which the pending parole revocation issues could be aired.

The District Court dismissed the petition without awaiting a responsive pleading, stating:

> "[A] parole revocation hearing is not required until the parole violator warrant has been executed. The parole board is under no obligation to execute the warrant inasmuch as petitioner has been in custody on his 1971 manslaughter [and murder] sentence[s] since the time the warrant was issued and filed as a detainer against him." [3]

The Court of Appeals affirmed, relying on its earlier holding in *Small* v. *Britton,* 500 F. 2d 299 (CA10 1974), in which that court had held that an incarcerated parolee is deprived of no liberty interest by the lodging of a detainer against him, and is thus entitled to no due process safeguards unless and until the parole violator warrant is actually executed.

---

not be released from custody until the jurisdiction asserting a parole violation has had an opportunity to act—in this case by taking the inmate into custody or by making a parole revocation determination. When two autonomous jurisdictions are involved, as for example when a federal detainer is placed against an inmate of a state institution, a detainer is a matter of comity.

[3] Civ. Action No. 75–28–C3 (Kan., Jan. 29, 1975).

82

(2)

The Parole Commission and Reorganization Act, Pub. L. 94–233, 90 Stat. 219 *et seq.*, was enacted shortly after we granted certiorari. The Act renamed the Board the Parole Commission and made other changes in federal parole procedures, principally to codify the Board's existing practices.[4] Throughout the progress of this case below, however, parole revocation procedures were controlled by the former statutes, 18 U. S. C. §§ 4205 and 4207.[5] Under them, and the Board's own regulations, 28 CFR § 2.53 (1975),[6] it was the Board's practice to issue a parole violator warrant as a matter

---

[4] The Commission's newly promulgated rule, 28 CFR § 2.57 (1976), validates any order of the Board entered prior to May 14, 1976 (the Act's effective date).

[5] Title 18 U. S. C. § 4205 provided:

"A warrant for the retaking of any United States prisoner who has violated his parole may be issued only by the Board of Parole or a member thereof and within the maximum term or terms for which he was sentenced. The unexpired term of imprisonment of any such prisoner shall begin to run from the date he is returned to the custody of the Attorney General under said warrant, and the time the prisoner was on parole shall not diminish the time he was sentenced to serve."

Title 18 U. S. C. § 4207 provided:

"A prisoner retaken upon a warrant issued by the Board of Parole, shall be given an opportunity to appear before the Board, a member thereof, or an examiner designated by the Board.

"The Board may then, or at any time in its discretion, revoke the order of parole and terminate such parole or modify the terms and conditions thereof.

"If such order of parole shall be revoked and the parole so terminated, the said prisoner may be required to serve all or any part of the remainder of the term for which he was sentenced."

[6] "(a) In those instances where the prisoner is serving a new sentence in an institution, the warrant may be placed there as a detainer. Such prisoner shall be advised that he may communicate with the Board relative to disposition of the warrant, and may request that it be withdrawn or executed so his violator term will run concurrently with the new sentence. Should further information be deemed necessary, the Regional

of course whenever a federal parolee was convicted of a new offense. Under the former statute and regulations, if the subsequent sentence called for incarceration the warrant was lodged at the institution of confinement as a detainer, for possible later service. A parolee so confined was then notified of the issuance of the unserved warrant and given the opportunity to make a written response. Upon receipt of the response the Board was authorized, in its discretion, to conduct a dispositional interview designed to get the facts relevant to its revocation decision. The parolee could retain counsel for the interview and call witnesses. In lieu of an interview, the Board in its discretion could review the parolee's case based on the record and the written response.

After review—or interview—the Board had three options for disposing of its parole violator warrant:

(a) It could execute the warrant immediately and take the parolee into custody. If parole was revoked at that

---

Director may designate a hearing examiner panel to conduct a dispositional interview at the institution where the prisoner is confined. At such dispositional interview the prisoner may be represented by counsel of his own choice and may call witnesses in his own behalf, provided he bears their expenses. He shall be given timely notice of the dispositional interview and its procedure.

"(b) Following the dispositional review the Regional Director may:

"(1) Let the detainer stand

"(2) Withdraw the detainer and close the case if the expiration date has passed;

"(3) Withdraw the detainer and reinstate to supervision; thus permitting the federal sentence time to run uninterruptedly from the time of his original release on parole or mandatory release.

"(4) Execute warrant, thus permitting the sentence to run from that point in time. If the warrant is executed, a previously conducted dispositional interview may be construed as a revocation hearing.

"(c) In all cases, including those where a dispositional interview is not conducted, the Board shall conduct annual reviews relative to the disposition of the warrant. These decisions will be made by the Regional Director. The Board shall request periodic reports from institution officials for its consideration."

stage, the remainder of the parolee's original federal sentence, reinstated by the parole revocation, would run concurrently with the subsequent sentence from the time of execution of the warrant. 18 U. S. C. § 4205. Execution of the warrant deprived the parolee of any good-time credits he might have previously earned on his original sentence under 18 U. S. C. § 4161, and of credit for the time spent while on parole. 18 U. S. C. § 4205; 28 CFR § 2.51 (1975).

(b) The Board's second option was to dismiss the warrant and detainer altogether, which operated as a decision not to revoke parole, and under which the parolee retained both his good-time credit and credit for the time spent on parole. Presumably dismissal of the warrant would reflect a Board decision that the violation of conditions of parole was not of such gravity as to justify revocation.

(c) Third, the Board was free to defer a final decision on parole revocation until expiration of the subsequent sentence, as it elected to do in this case; under this third option, the Board was authorized to execute the warrant, take the parolee into custody immediately upon his release, and then conduct a revocation hearing. Deferral of decision while permitting the warrant to stand unexecuted would operate to allow the original sentence to remain in the status it occupied at the time of the asserted parole violation, 18 U. S. C. § 4205; it would not deprive the parolee either of his good time or of the time spent on parole.

Respondent represents that the Board's general practice, before passage of the 1976 Act, was to defer decision in order to have before it the parolee's institutional record during his confinement on the subsequent offense. That record would obviously be highly relevant to the parole revocation decision. Annual reviews of the status of every parolee to whom it had not granted a dispositional interview were conducted under the former statute.

The 1976 Act and accompanying regulations, 28 CFR § 2.1

*et seq.* (1976), incorporate the former procedures with few modifications. Under current law, the Parole Commission reviews the parole violator warrant within 180 days of its issuance, 18 U. S. C. § 4214 (b)(1) (1976 ed.); the parolee, after notification of the impending review, is now entitled to assistance of appointed counsel, if requested, in preparing his written response. 18 U. S. C. § 4214 (a)(2)(B) (1976 ed.). The 1976 Act also abolishes the annual status review formerly required. Previously it was general practice to defer execution of the warrant to completion of the subsequent sentence. It is now firm Commission policy that unless "substantial mitigating circumstances" are shown, the parole violator term of a parolee convicted of crime is to run consecutively to the sentence imposed for the subsequent offense. 28 CFR § 2.47 (c) (1976).

Petitioner asserts protected liberty interests in both the length and conditions of his confinement. Those interests, he argues, are disregarded in several respects by issuance against him of an unexecuted parole violator warrant, which bars him from serving his 1962 rape conviction sentence concurrently with his 1971 homicide sentences, retards his parole eligibility on the later convictions, and adversely affects his prison classification status. He argues that lack of a prompt hearing risks the loss of evidence in mitigation which might induce the Board not to revoke his parole. Respondent's position is that whatever process may eventually be due petitioner, the mere issuance of a parole violator warrant works no present deprivation of protected liberty sufficient to invoke due process protection.

### (3)

In *Morrissey,* we held that the conditional freedom of a parolee generated by statute is a liberty interest protected by the Due Process Clause of the Fourteenth Amendment which may not be terminated absent appropriate due process safe-

guards. The revocation hearing mandated by *Morrissey* [7] is bottomed on the parallel interests of society and the parolee in establishing whether a parole violation has occurred and, if so, whether under all the circumstances the quality of that violation calls for parole revocation. The issue before us here, however, is not whether a *Morrissey*-type hearing will ever be constitutionally required in the present case, [8] but whether a hearing must be held at the present time, before the parolee is taken into custody as a parole violator. We hold that there is no requirement for an immediate hearing.

Petitioner's present confinement and consequent liberty loss derive not in any sense from the outstanding parole violator warrant, but from his two 1971 homicide convictions. Issuance of the warrant and notice of that fact to the institution of confinement did no more than express the Board's intent to defer consideration of parole revocation to a later time.

---

[7] In the present case, where petitioner has already been convicted of and incarcerated on a subsequent offense, there is no need for the preliminary hearing which *Morrissey* requires upon arrest for a parole violation. This is so both because the subsequent conviction obviously gives the parole authority "probable cause or reasonable ground to believe that the . . . parolee has committed acts that would constitute a violation of parole conditions," 408 U. S., at 485, and because issuance of the warrant does not immediately deprive the parolee of liberty. The 1976 Act calls for no preliminary hearing in such cases. 18 U. S. C. § 4214 (b) (1) (1976 ed.); see 28 CFR § 2.48 (f) (1976).

[8] Congress has provided a statutory right to a parole revocation hearing along *Morrissey* lines even where the parolee "knowingly and intelligently admits violation" of the terms of his parole, or has been convicted of a crime committed while on parole and is therefore barred from relitigating facts constituting a parole violation. 18 U. S. C. §§ 4214 (c), (d) (1976 ed.); see *Morrissey, supra*, at 490. At the hearing the parolee may present evidence addressed to whether, given his admitted violation, circumstances exist justifying his continued release on parole. 28 CFR § 2.50 (1976). Petitioner will be entitled to this statutory hearing within 90 days after execution of the warrant. 18 U. S. C. § 4214 (c) (1976 ed).

Though the gravity of petitioner's subsequent crimes places him under a cloud, issuance of the warrant was not a determination that petitioner's parole under his 1962 rape conviction will be revoked; the time at which the Commission must make that decision has not yet arrived. With only a prospect of future incarceration which is far from certain, we cannot say that the parole violator warrant has any present or inevitable effect upon the liberty interests which *Morrissey* sought to protect. Indeed, in holding that "[t]he revocation hearing must be tendered within a reasonable time after the parolee is taken into custody," *Morrissey*, 408 U. S., at 488, we established execution of the warrant and custody under that warrant as the operative event triggering any loss of liberty attendant upon parole revocation. This is a functional designation, for the loss of liberty as a parole violator does not occur until the parolee is taken into custody under the warrant. Cf. 18 U. S. C. § 4206; 18 U. S. C. § 4213 (d) (1976 ed.).

The other injuries petitioner claims to suffer either do not involve a loss of protected liberty or have not occurred by reason of the warrant and detainer. His real complaint is that he desires to serve his sentence for the 1962 rape conviction concurrently with his sentences for two 1971 homicides. But, as we have noted, even after completion of the homicide sentences the Commission retains full discretion to dismiss the warrant or decide, after hearing, that petitioner's parole need not be revoked. If revocation is chosen, the Commission has power to grant, retroactively, the equivalent of concurrent sentences and to provide for unconditional or conditional release upon completion of the subsequent sentence. See 18 U. S. C. §§ 4211, 4214 (d) (1976 ed.); 28 CFR §§ 2.21, 2.52 (c)(2) (1976). Thus, deferral of the revocation decision does not deprive petitioner of any such opportunity;

nothing in the statute or regulations gives him any "right" to force the decision of the Commission at this time.[9]

Petitioner also argues that issuance of a parole violator warrant, without more, diminishes his opportunity for parole on his intervening sentence. Assuming for the moment that granting of parole is a protected liberty interest which this warrant impinges, this argument fails to take into account that here the same Commission which will consider petitioner's parole under his 1971 homicide convictions will decide whether to revoke parole granted under the 1962 conviction. The statutory hearing to which petitioner will be entitled upon his application for release on parole will give him the same full opportunity to persuade the Commission that he should be released from federal custody as would an immediate hearing on the parole violator warrant. Whether different issues would be presented by the prospect of adverse action by different and autonomous parole authorities, we need not consider.

---

[9] Petitioner further claims that evidence of mitigation may be lost if the revocation hearing is not held promptly, but he makes no claim that there is additional evidence in his case which may be vitiated by a delay. Had such claims been made, the Commission has the power, as did the Board before it, to conduct an immediate hearing at which petitioner can preserve his evidence. 18 U. S. C. § 4214 (b)(2) (1976 ed.); 28 CFR § 2.47 (1976).

Petitioner also argues that the pending warrant and detainer adversely affect his prison classification and qualification for institutional programs. We have rejected the notion that every state action carrying adverse consequences for prison inmates automatically activates a due process right. In *Meachum* v. *Fano*, 427 U. S. 215 (1976), for example, no due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a "grievous loss" upon the inmate. The same is true of prisoner classification and eligibility for rehabilitative programs in the federal system. Congress has given federal prison officials full discretion to control these conditions of confinement, 18 U. S. C. § 4081, and petitioner has no legitimate statutory or constitutional entitlement sufficient to invoke due process.

Finally, there is a practical aspect to consider, for in cases such as this, in which the parolee admits or has been convicted of an offense plainly constituting a parole violation, the only remaining inquiry is whether continued release is justified notwithstanding the violation. This is uniquely a "prediction as to the ability of the individual to live in society without committing antisocial acts." *Morrissey, supra,* at 480. In making this prophecy, a parolee's institutional record can be perhaps one of the most significant factors. Forcing decision immediately after imprisonment would not only deprive the parole authority of this vital information, but since the other most salient factor would be the parolee's recent convictions, here a double homicide, a decision to revoke parole would often be foreordained. Given the predictive nature of the hearing, it is appropriate that such hearing be held at the time at which prediction is both most relevant and most accurate—at the expiration of the parolee's intervening sentence.

Accordingly, and without regard to what process may be due petitioner before his parole may be finally revoked, we hold that he has been deprived of no constitutionally protected rights simply by issuance of a parole violator warrant. The Commission therefore has no constitutional duty to provide petitioner an adversary parole hearing until he is taken into custody as a parole violator by execution of the warrant.

*Affirmed.*

Mr. Justice Stevens, with whom Mr. Justice Brennan joins, dissenting.

The Court holds that the lodging of a detainer with an institution in which a parolee is confined does not have the kind of impact on his custodial status that requires a due process hearing. That holding does not answer the question which I regard as critical in this case. For it is clear that sooner or later a parole revocation hearing will be held; the

question is whether the timing of that hearing is an element of the procedural fairness to which the parolee is constitutionally entitled. I am persuaded that it is.

I start from the premise that parole revocation is a deprivation of liberty within the meaning of the Fifth and Fourteenth Amendments and therefore must be preceded by due process. The Court so held in *Morrissey* v. *Brewer,* 408 U. S. 471, 481–483. In that case the revocation resulted in the return of the parolee to prison whereas in this case the parolee is already incarcerated for a separate offense. But in both situations the revocation affects the length of his confinement and therefore may result in a "grievous loss" of liberty.[1] Accordingly, it is clear—and I do not understand the Court to disagree, see *ante,* at 85–86, 89—that the parolee's constitutional right to have the revocation hearing conducted fairly is not affected by his custodial status.[2] Moreover, since the

---

[1] In *Wolff* v. *McDonnell,* 418 U. S. 539, 558, the Court held that loss of "good-time credits" was a deprivation of liberty which required due process protections because the loss of credits could lengthen confinement.

"We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government, *Dent* v. *West Virginia,* 129 U. S. 114, 123 (1889). Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed." *Ibid.*

Similarly, as the Seventh Circuit held in *United States ex rel. Miller* v. *Twomey,* 479 F. 2d 701, 715 (1973): "The time when an inmate may enjoy liberty is directly affected by the disallowance of statutory good time. . . . The cancellation of such credits thus inflicts the same kind of 'grievous loss' on the prisoner as does the revocation of parole [citing *Morrissey*]."

[2] The status of the incarcerated parolee is comparable to that of a defendant on trial for one offense who is already imprisoned for another. Cf. *Smith* v. *Hooey,* 393 U. S. 374; *Strunk* v. *United States,* 412 U. S. 434, 439.

parole revocation process begins when the Parole Commission issues the revocation warrant,[3] it plainly follows that the constitutional protections afforded the parolee attach at that time. The question, then, is whether the parolee's right to a fair hearing includes any right to have the hearing conducted with reasonable dispatch.

It is apparently the position of the Parole Commission that it has no obligation to go forward with the revocation hearing until after the parolee has completed the service of his sentence for the second offense.[4] It may therefore wait as long as 10 or 20 years after commencing the revocation process by issuing a warrant. This position, I submit, can be tenable only if one assumes that the constitutional right to a fair hearing includes no right whatsoever to a prompt hearing. Precedent, tradition, and reason require rejection of that assumption.

In *Klopfer* v. *North Carolina*, 386 U. S. 213, 226, the Court

---

[3] The issuance of a parole revocation warrant suspends the running of a convict's sentence and parole until final disposition of the parole violation charges may be made by the Commission. 28 CFR § 2.44 (d) (1976). The issuance of the warrant must be considered the commencement of the parole revocation process, since suspension of the running of a parolee's sentence could not otherwise be justified. Thus, the due process protections, which the Court has held apply to the parole revocation process, *Morrissey*, attach at that time.

[4] The majority suggests that under the prior law, which has governed this case since its filing, the Parole Board if it revoked parole as to a parolee while he was incarcerated on an intervening sentence, would be required to make the service of both sentences concurrent. See *ante*, at 83–84, citing 18 U. S. C. § 4205. I do not read § 4205 as placing such a restriction on the Board's discretion, but even if it did, such a statutory provision does not affect the constitutional question. Moreover, whatever the effect of § 4205, this statute has been overridden by the Parole Commission and Reorganization Act, Pub. L. 94–233, 90 Stat. 219. Thus, 18 U. S. C. § 4210 (b) (2) (1976 ed.) now expressly allows the Commission to determine whether the two sentences will be served "concurrently or consecutively."

held that the States were required by the Due Process Clause
of the Fourteenth Amendment to provide a defendant with a
prompt hearing because the right to a speedy trial "is one of
the most basic rights preserved by our Constitution."
That holding rested in part on common-law tradition of
such a fundamental nature as to be reflected in the Magna
Carta itself.[5] In that case, Mr. Justice Harlan, though dis-
agreeing with the view that the "speedy trial" provision of
the Sixth Amendment was directly applicable to the States,
concurred with the conclusion that a state procedure
"which in effect allows state prosecuting officials to put a
person under the cloud of an unliquidated criminal charge for
an indeterminate period, violates the requirement of funda-
mental fairness assured by the Due Process Clause of the
Fourteenth Amendment." *Id.*, at 227.

The common-law tradition that supports both the Court's
holding and Mr. Justice Harlan's separate concurrence in

---

[5] As the Court noted, 386 U. S., at 224, the Magna Carta as interpreted
by Sir Edward Coke guaranteed to all speedy justice.

"In [Coke's] explication of Chapter 29 of the Magna Carta, he wrote
that the words 'We will sell to no man, we will not deny or defer to any
man either justice or right' had the following effect:

" 'And therefore, every subject of this realme, for injury done to him *in
bonis, terris, vel persona,* by any other subject, be he ecclesiasticall, or
temporall, free, or bond, man, or woman, old, or young, or be he out-
lawed, excommunicated, or any other without exception, may take his
remedy by the course of the law, and have justice, and right for the
injury done to him, freely without sale, fully without any deniall, and
speedily without delay.' " Quoting E. Coke, 2 Institutes 55 (Brooke, 5th
ed., 1797).

The opinion in *Klopfer,* 386 U. S., at 225–226, n. 21, also notes that
the Massachusetts Constitution of 1780, Part I, Art. XI, provided:

"Every subject of the commonwealth ought to find a certain remedy,
by having recourse to the laws, for all injuries or wrongs which he may
receive in his person, property, or character. He ought to obtain right
and justice freely, and without being obliged to purchase it; completely,
and without any denial; promptly, and without delay; conformably to
the laws."

*Klopfer,*[6] also requires respect for a parolee's interest in the reasonably prompt disposition of charges pending against him, regardless of whether or not he is incarcerated.

This Court has already held that present incarceration for one offense does not deprive an inmate of his right to a prompt trial on a second charge. *Smith* v. *Hooey,* 393 U. S. 374; *Strunk* v. *United States,* 412 U. S. 434. Moreover, the Court has made it clear that the constitutional protection applies not only to the determination of guilt but also to the discretionary decision on what disposition should be made of the defendant. This point was squarely decided with respect to parole revocation in *Morrissey* v. *Brewer.*[7] And in *Pollard* v. *United States,* 352 U. S. 354, the Court, though rejecting the particular claim, recognized that a defendant's right to a speedy trial included a right to a prompt sentencing determination. The entire Court subscribed to the view that delay in regard to disposition "must not be purposeful or oppressive." *Id.,* at 361. That view contrasts sharply with the Parole Commission's conscious policy of delaying parole revocation decisions under these circumstances.

Those holdings recognize the defendant's legitimate interest in changing the uncertainty associated with a pending charge into the greater certainty associated with its disposition.[8] In the words of a former director of the Federal

---

[6] "To support that conclusion I need only refer to the traditional concepts of due process set forth in the opinion of THE CHIEF JUSTICE." 386 U. S., at 227.

[7] "There must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority. This hearing . . . must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation." 408 U. S., at 487–488.

[8] The prisoner also has an interest in disposing of detainers because they may affect the conditions and extent of his custody. "[U]nder procedures now widely practiced, the duration of [a prisoner's] present imprisonment may be increased, and the conditions under which he must

Bureau of Prisons that were quoted by the Court in *Smith,
supra,* at 379, the " 'anxiety and concern' " which accompany unresolved charges have as great an impact on the incarcerated as on those at large.[9]

"[I]t is in their effect upon the prisoner and our attempts

---

serve his sentence greatly worsened, by the pendency of another criminal charge outstanding against him." *Smith* v. *Hooey,* 393 U. S., at 378.

Moreover, the Court in *Smith* quoted a former director of the Federal Bureau of Prisons as writing:

" 'Today the prisoners with detainers are evaluated individually but there remains a tendency to consider them escape risks and to assign them accordingly. In many instances this evaluation and decision may be correct, for the detainer can aggravate the escape potentiality of a prisoner.' Bennett, 'The Last Full Ounce,' 23 Fed. Prob. No. 2, p. 20, at 21 (1959)." *Id.,* at 379 n. 8.

Under present Bureau of Prisons' policy, a detainer will not preclude a more lenient classification of a prisoner, but "the seriousness of a detainer must be considered when custody reductions are considered." Bureau of Prisons, Policy Statement 7300.112 ¶ 4 (Apr. 8, 1976). See also Bureau of Prisons, Policy Statement 7500.72 ¶ 4 (May 8, 1972).

It should be noted that if a prisoner would rather face the uncertainty and restrictions which might occur because of an outstanding detainer in hopes that the Commission would prove more lenient at a later revocation hearing, he could certainly waive his right to a prompt hearing.

[9] The Bureau of Prisons recognizes the detriments created by allowing detainers to remain unexecuted.

"Because uncertainty as to status can have an adverse effect on our efforts to provide offenders with correctional services, we should encourage detaining authorities to dispose of pending untried charges against offenders in federal custody.

"The casework staff at all institutions may cooperate with and give assistance to offenders in their efforts to have detainers against them disposed of, either by having the charges dropped, by restoration to probation, or parole status or by arrangement for concurrent service of the state sentence.

. . . . .

"The presence of a detainer oftentimes has a restricting effect on efforts to involve the offender in correctional programs. For this reason, caseworkers at federal institutions are expected to assist offenders in their

to rehabilitate him that detainers are most corrosive. The strain of having to serve a sentence with the uncertain prospect of being taken into . . . custody . . . at the conclusion interferes with the prisoner's ability to take maximum advantage of his institutional opportunities. His anxiety and depression may leave him with little inclination toward self-improvement." [10]

Although those comments were directed at the prisoner's right to a prompt trial on a second criminal charge, they are also applicable to the incarcerated parolee's interest in a reasonably prompt revocation hearing.

Under the respondent's position, the petitioner's hearing may come as much as 10 years after his intervening conviction. It is unlikely that such a delayed hearing would focus on the question whether facts in mitigation existed at the time of commission of the intervening offense; rather, the primary inquiry would no doubt be directed at the question whether petitioner made satisfactory institutional progress in the service of his intervening sentence to justify his return to society. That is the sort of inquiry that would in any event be appropriate in a parole *release* hearing. In short, a prolonged delay will inevitably change the character of the revocation hearing. If unlimited delay is permitted, the procedural safeguards which were fashioned in *Morrissey* to assure the parolee a fair opportunity to present facts in mitigation and to challenge the government's assertions will have become meaningless. Delay will therefore violate the "fundamental requirement of due process"—"the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews* v. *Eldridge,* 424 U. S. 319, 333, quoting *Armstrong* v. *Manzo,* 380 U. S. 545, 552.

Petitioner argues that the detainer itself is the source of

efforts to have detainers disposed of." Bureau of Prisons, Policy Statement 7500.14A (Jan. 7, 1970).

[10] Bennett, The Last Full Ounce, 23 Fed. Prob. No. 2, pp. 20, 21 (1959).

his grievous loss which mandates a hearing. That is not my view. In my judgment the detainer is comparable to an arrest or an indictment which identifies a time when it is clear that the government has a basis for going forward with appropriate proceedings and from which the right to a speedy determination accrues.[11] Since I believe the right to orderly procedure leading to a reasonably prompt decision is a fundamental attribute of due process, I cannot accept the conclusion that the right is vindicated by simply lodging a detainer and letting it remain outstanding for year after year while the prisoner's interest in knowing where he stands may be entirely ignored.[12]

I therefore respectfully dissent.

---

[11] By emphasizing the fact that the filing of a warrant starts the parole revocation process, I do not mean to imply that the parolee's right to a prompt revocation hearing should depend upon the filing of a warrant. If the Commission has full notice of a parolee's intervening conviction, it should not be permitted to wait until the termination of the intervening sentence to act. Compare *United States* v. *Marion*, 404 U. S. 307 (holding that due process places some restraints on government delay in bringing an indictment) with *Barker* v. *Wingo*, 407 U. S. 514 (a speedy trial case).

[12] I do not imply that the parole authorities actually discharge their responsibilities in such a heartless manner. But I cannot accept a constitutional holding that would permit them to do so.

I should also make clear that I would not prescribe any inflexible rule that the hearing must always take place within a fixed period. Nor would I require that the prisoner's interest in a reasonably prompt determination of his status always mandate a personal appearance either at the place of his incarceration or at the place where the parole board normally sits. If justification for the revocation is established by a new conviction, there would seldom be need for a hearing on the discretionary aspects of revocation—certainly not unless strong mitigating circumstances were identified. But the fact that the prisoner has only a slight chance of prevailing on the merits does not justify a total rejection of his interest in a prompt disposition. Moreover, if, as respondent contends, delay will sometimes be in the parolee's best interest, the parolee could always waive his right to a prompt hearing.